579 So.2d 956 (1991)
STATE of Louisiana
v.
Isaac KNAPPER.
No. 90-KP-1435.
Supreme Court of Louisiana.
May 6, 1991.
*957 Laurie A. White, Michael G. Riehlmann, for relator Isaac Knapper.
Harry F. Connick, Dist. Atty., Jack Peebles, Pamela Moran, for plaintiff-respondent State of La.
LEMMON, Justice.
The issue in this post-conviction proceeding is whether the prosecutor, after being requested to disclose exculpatory evidence in the capital murder case, withheld from the defense a police report containing information favorable to the defendant and material to the issue of his guilt or innocence.
On April 12, 1979 at about 9:00 p.m., two young black men, one holding a revolver, confronted two tourists outside a New Orleans hotel and demanded money. When the murder victim, Dr. Ronald Banks, reacted by saying "You've got to be kidding", Dr. Banks' companion, Dr. John Hakola, struck out at the unarmed robber who was closest to him, and ran for the hotel entrance. The armed robber then struggled with Dr. Banks and shot him in the head, killing him instantly.
In early May, 1979, the police arrested defendant and Leroy Williams. Both were eventually indicted for first degree murder. Williams, when offered a plea bargain reducing the charge against him to manslaughter, agreed to testify against defendant.
Two experienced capital defense attorneys were appointed to represent defendant. On June 21, 1979, lead defense counsel filed a prayer for oyer in which he requested in Subparagraph 3(f), "A complete copy of that part of the District Attorney's file and/or any supplemental information or evidence being held by the New Orleans Police Department or any other law enforcement agency that could be used on the trial of this matter of an exculpatory nature, that may aid the defendant in his defense". The prosecutor answered as to Subparagraph 3, "These will be made available at the defendant's convenience with the exception of Section F to which defendant is not entitled".
Because Dr. Hakola was unable to identify defendant as one of the robbers, the prosecutor's case at trial rested solely on the testimony of Williams, as supported in some details by the testimony of Dr. Hakola.[1] Williams testified that on the night of the murder defendant asked him if he wanted to "make some money". According to Williams, defendant was wearing a black shirt, blue jeans, a white cap and a bandana, which he pulled up onto his face *958 as they approached the tourists near the hotel. Williams stated that defendant drew a pistol and demanded money, to which one of the victims responded, "You've got to be kidding", whereupon defendant shot the victim.
Dr. Hakola testified that the gunman wore a dark shirt, dark pants, a grayish-white sailor hat pulled down over his eyes, and a dark bandana covering his face. He stated defendant had the same physical build as the gunman, but could not positively identify defendant as the gunman. He also repeated Dr. Banks' statement, "You've got to be kidding".
Thus, Dr. Hakola's testimony about the "You've got to be kidding" statement supported Williams' testimony, but tended to prove only that Williams was at the scene of the crime, a fact not in itself damaging to defendant. However, Dr. Hakola's description of the gunman's clothing supported Williams' description of defendant's clothing and tended to prove defendant was with Williams at the scene, a fact very damaging to defendant.[2]
In closing argument the prosecutor, knowing that the judge would instruct the jury on the suspect nature of accomplice testimony, twice emphasized the corroboration by Dr. Hakola as to the details of Williams' clothing description.
The jury found defendant guilty of first degree murder, but recommended against imposition of the death penalty. This court, under its then existing appellate jurisdiction, affirmed the conviction and sentence. 458 So.2d 1284.
Following this court's recognition in State v. Shropshire, 471 So.2d 707 (La. 1985) of a defendant's entitlement under La.Rev.Stat. 44:3 A(4) to the initial police report of a criminal investigation, defendant obtained a copy of a thirty-one-page report by Detective John Dillman of the investigation of Dr. Banks' murder. In the report Dr. Hakola described the gunman as a young black male, wearing a white short sleeve shirt, blue jeans, a red and white bandana on the lower portion of his face, and possibly a white cap, and carrying a chrome-plated revolver. He further stated the other robber was wearing a black short sleeve shirt, blue jeans and a white cap. He added that only the robber in the white shirt was armed.
Another witness listed in the Dillman report also stated that the gunman wore a white shirt.
Detective Dillman's report also described an April 19, 1979 armed robbery of tourists near another New Orleans hotel, about five blocks from the scene of the Banks murder, in which "the general physical description, along with the clothing description, of [the three apprehended robbers] closely matched the description of the two wanted subjects in the Murder of Roland Banks". The information on this similar and temporally proximate armed robbery became significant when testing of the pistol recovered from the robbers revealed that it was the same weapon that fired the fatal shot in the murder of Dr. Banks. The victims of the April 19 robbery identified Rickey Mazique as the gunman, Samuel Washington (who was wearing a white sailor cap similar to those worn by the robbers of Dr. Banks) as the robber who handed the gun to Mazique, and Derrick Robertson as the other robber. Mazique informed Detective Dillman that Washington had obtained the gun from Jeffrey Zimmerman a few hours before the robbery. Zimmerman informed Detective Dillman that he found the gun in a housing project in January, 1979 and placed the gun in a cardboard box in a *959 closet in his residence, where it stayed until he gave it to Washington on April 19. Zimmerman stated that only his brother Kirk knew of the location of the weapon.
Upon obtaining the Dillman report, defendant filed an application for post-conviction relief, contending that the prosecutor withheld the report which contained significant exculpatory evidence about (1) the custody and control of the murder weapon during the time period surrounding the murder, (2) the commission of a similar armed robbery of tourists near a downtown hotel one week after the murder by robbers using the murder weapon and fitting the physical and clothing description of the robbers in the Banks murder, and (3) the discrepancy in the clothing description by Dr. Hakola in the report with his trial testimony which bolstered Williams' otherwise suspect testimony, the only evidence linking defendant to the crime.
The trial court denied the application without a hearing. This court then granted defendant's application and ordered an evidentiary hearing. 545 So.2d 1045.
At the evidentiary hearing the prosecutor who handled the trial testified that he turned his entire file over to the lead defense lawyer who had died between the trial and the post-conviction hearing. He could not recall when he did so, but his "normal routine" with this attorney was to tell the attorney to inspect the file at his convenience. The prosecutor stated he would not have turned the file over to the other attorney.
Co-counsel for defendant testified that he never saw the file, that deceased co-counsel never indicated he received the file, and that it was not the practice of the district attorney's office to turn files over to the public defender. He denied knowledge by the defense team of any of the significant information contained in the Dillman report and asserted they certainly would have used the information, if it had been disclosed, to cross-examine witnesses and to help establish a reasonable doubt.
The trial judge denied relief after indicating during the hearing that the single issue was whether the prosecutor had given the Dillman report to deceased counsel. We granted defendant's application for certiorari. 572 So.2d 52.
The prosecutor may not suppress evidence which is favorable to the defendant and material of the issue of defendant's guilt or innocence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Favorable evidence includes both exculpatory evidence and impeachment evidence. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The evidence is material if there is a reasonable probability, sufficient to undermine confidence in the outcome, that the evidence, if disclosed to the defense, would have changed the outcome of the proceeding or created a reasonable doubt that did not otherwise exist. Id.
The outset question is whether the prosecutor withheld the evidence. The prosecutor's testimony that he turned over his file to deceased defense counsel is contradicted, not only by the absence in the record of his responding to the discovery request for exculpatory evidence, but also by the presence in the record of his response to the prayer for oyer which denied defendant's entitlement to the requested information. Other circumstances raise substantial doubt that the prosecutor produced the Dillman report for the defense: the prosecutor could not recall when he turned over the file, which raises the question of whether the Dillman report was in the file at the time the prosecutor made it available; the prosecutor's specific questions to Dr. Hakola on the color of the gunman's shirt suggest that he did not expect defense counsel to impeach Dr. Hakola in that regard based on information contained in the report;[3] defense co-counsel denied receiving the file or having any knowledge of the Dillman report which contained extremely useful information relevant *960 to this significant capital case; and the conduct of deceased co-counsel, an experienced attorney in capital cases, in not attempting to utilize any of the significant information contained in the report makes it highly unlikely that he had any knowledge of the contents of the report. It is almost inconceivable that an experienced capital defense attorney would have been given a document in which the arresting officer (who recovered the murder weapon in an armed robbery of tourists near a downtown hotel one week later) said "the general physical description, along with the clothing description, of the three subjects closely matched the description of the two wanted subjects in the Murder of Ronald Banks" and not attempted to get before the jury the information that the officer investigating the Banks murder deemed significant enough to include in his report.
On the record of the post-conviction hearing we conclude that the prosecution failed to disclose the Dillman report to the defense.[4]
It is evident (and the state concedes) that the Dillman report contained evidence, both exculpatory and impeachment, favorable to defendant. The remaining question is whether there is a reasonable probability the evidence, if disclosed to the defense, would have changed the outcome or created a reasonable doubt not otherwise existing.
Impeaching Dr. Hakola with his prior inconsistent statement as to the color of the gunman's shirt would not, by itself, likely have changed the outcome. Nevertheless, since Dr. Hakola could not identify defendant as the gunman, the principal value of his testimony was to bolster the otherwise suspect testimony of Williams, who presented the only evidence connecting defendant with the murder. If Dr. Hakola had conceded under cross-examination that his description of the gunman's shirt immediately after the incident was probably more accurate than his trial testimony on direct, there would have been some contradiction by Dr. Hakola of Williams' testimony, and the prosecutor could not have emphasized in closing argument the exactness of the two clothing descriptions or stressed that both Williams and Dr. Hakola stated the gunman was wearing a black shirt, blue jeans, white hat and bandana.[5]
The impeachment value of Dr. Hakola's prior inconsistent statement becomes more significant when considered with the other exculpatory evidence contained in the Dillman report. When the murder weapon was introduced into evidence, the jurors learned only that the police had recovered the weapon one week after the murder from the perpetrators of an apparently unrelated armed robbery. The defense, if furnished with the Dillman report, could have shown that the weapon was recovered one week after the Banks murder when three young black males, matching the physical and clothing description of the robbers in the Banks murder, used the murder weapon to rob tourists near a downtown hotel five blocks from the scene of the Banks murder. This evidence could have had significant value in creating a reasonable doubt that did not otherwise exist in a capital case which relied almost solely on the suspect testimony of an accomplice who turned state witness to avoid the electric chair.
The report would also have led the defense to Jeffrey Zimmerman, who had told the police he had the gun in his possession during the time period which included the night of the murder. The defense could also have cross-examined Williams on his statement in the Dillman report that to his knowledge defendant had possession of the *961 gun for three months before the murder.[6] The defense could also have investigated prior to trial any relationship between Williams and Zimmerman or the three perpetrators of the April 19 robbery.[7]
We conclude from this record that there is a reasonable probability the evidence in the Dillman report, if it had been disclosed to the defense, would have created a reasonable doubt that did not otherwise exist, and the prosecutor's failure to disclose the report thus deprived defendant of the opportunity for a fair trial. Defendant is therefore entitled to post-conviction relief.
Accordingly, the conviction and sentence are reversed, and the matter is remanded to the district court for a new trial.
WATSON and COLE, JJ., dissent for reasons assigned by MARCUS, J.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting):
First, I believe the majority engages in speculation when it concludes the prosecution failed to disclose the Dillman report to the defense. However, even assuming the report was not disclosed, I do not consider that the information contained in it was sufficient to change the outcome of the proceeding or create a reasonable doubt which did not otherwise exist. As the majority concedes, Dr. Hakola's prior inconsistent statement as to the color of the gunman's shirt by itself would not have changed the outcome. The effect of this statement is even more attenuated when used to cast doubt on Williams' testimony. The jury determined Williams to be a credible witness. The failure of Dr. Hakola to corroborate Williams' testimony on a minor detail such as shirt color would not have been sufficient to cause the jury to reject this testimony.
Moreover, I do not consider that disclosure of the evidence relating to the gun would have changed the outcome of the trial. The report merely states that the murder weapon was recovered one week after the murder from the three black males who used the weapon to rob tourists near a hotel five blocks from the murder scene. The report does not disclose any connection or relationship between defendant and the three perpetrators of the later robbery. Likewise, Jeffrey Zimmerman's statement that he had the gun in his possession at the time of the murder would have been of little value to the defense, since the scientific tests clearly placed the gun at the scene of the murder. Accordingly, I respectfully dissent.
NOTES
[1] Williams' testimony was also supported to some extent by his mother's relation of Williams' prior consistent statement. Williams' mother testified that Williams had told her, after they learned of defendant's arrest, that he and defendant had attended a wrestling match near the hotel on the night of the murder, but did not tell her what happened. This statement tended to support Williams' testimony that he and defendant were together near the crime scene on the night of the murder.
[2] The defense presented the testimony of defendant and of several of his relatives and friends who verified that defendant was playing records with them at his mother's house at the time of the crime. A prison inmate also testified that Williams told him Williams' mother made him (Williams) "lie on" defendant in order to help himself.

The defense also called three eyewitnesses who were near the scene of the murder. One testified that she saw three men running from the scene, one of whom was Williams, but that defendant was not one of the three. The second testified that three men ran from the scene and that neither defendant nor Williams were among the three. The third testified that defendant was not one of the two men he saw running from the scene.
[3] The prosecutor specifically asked Dr. Hakola if he remembered the color of the gunman's shirt.
[4] If the prosecutor in fact disclosed the Dillman report to the defense, defendant's claim of ineffective assitance of counsel in failing to use the information at trial would be entitled to serious consideration.
[5] Dr. Hakola's other important corroboration of Williams' testimony was in the "You've got to be kidding" statement. As stated earlier, the accuracy of Williams' testimony regarding that statement tends to prove only that Williams was one of the robbers and not to support Williams' assertion that defendant was the other.
[6] At trial Williams asserted that he would not have gone with defendant that night if he had known defendant had a gun.
[7] The Dillman report does not mention that he was able to develop any connection or relationship between defendant and Zimmerman or the three perpetrators of the April 19 robbery.