596 So.2d 177 (1992)
STATE of Louisiana
v.
John L. SULLIVAN.
No. 87-KA-0027.
Supreme Court of Louisiana.
March 2, 1992.
Rehearings Denied April 9, 1992.
*179 Richard Phillip Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Jack Peebles, Martin Melton, Beryl M. McSmith, Richard Olsen, Asst. Dist. Attys., for appellee.
John W. Reed, Glass & Reed, William Keppel, Christopher J. Riley, Tamara J. Byram, Karen A. Fairbairn, Dorsey & Whitney, for appellants.
John L. Sullivan, pro se.
COLE, Justice.
Defendant John Sullivan was convicted by a jury of the first degree murder, during the perpetration of an armed robbery at a New Orleans bar, of Joseph King, a bar patron. The jury subsequently recommended imposition of the death penalty, a recommendation with which the trial court agreed. Sullivan now appeals both the conviction and the sentence on a myriad of grounds. For the reasons which follow, we affirm the conviction but vacate the death sentence and remand to the trial court for a new sentencing proceeding.

I.
On the evening of April 13, 1980, defendant Sullivan was in the Polka Dot Lounge on St. Charles Avenue in New Orleans. At about 10:30 p.m., Michael Hillhouse, who had arrived in New Orleans a few days earlier, entered the bar and began drinking beer. Sullivan introduced himself to Hillhouse, and the two continued talking and drinking. Sullivan asked Hillhouse if he wanted to make some quick money, and Hillhouse affirmed that he did so desire. Sullivan retrieved a black vinyl bag from behind the bar and returned to the table. He showed Hillhouse the bag which contained a sawed-off shotgun, and Hillhouse agreed to commit an armed robbery with Sullivan.
At about 3:30 a.m., April 14, they left the bar and drove to the C-Note Lounge, also on St. Charles Avenue. They entered the lounge, went to the far end of the bar, and ordered beers. Hillhouse decided to play pool but had only a quarter, and the table required fifty cents. Joseph King, a regular patron of the bar, offered another quarter if he could play a game of pool with *180 Hillhouse. The two played for about fifteen minutes. When the game ended, Hillhouse returned to his seat beside Sullivan, and King returned to his seat at the other end of the bar. Sullivan and Hillhouse moved to stools nearer the door.
Sullivan asked Hillhouse if he was ready. When Hillhouse said yes, Sullivan rose from his stool, backed up, raised the sixteen-gauge shotgun from beneath his coat, and shot King in the chest with a slug. The force of the blast knocked King off the stool and against the side wall, where he dropped to the floor. Sullivan reloaded the shotgun and ordered Hillhouse to the other end of the bar. Sullivan then placed the gun at the head of Mark Legorretta, another customer, and demanded his wallet. He took a gold watch off Legorretta's wrist. Sullivan next ordered Stephanie Lowery, the bartender, to empty the cash register. She took $150.20 from the register and gave it to Sullivan. Hillhouse joined Sullivan at the other end of the bar. The two men then backed out of the lounge and made good their escape in a stolen vehicle driven by Sullivan.
Sullivan gave Hillhouse $50.00 of the stolen money before emerging from the vehicle. Both men re-entered the Polka-Dot Lounge, drank beer, and shot pool until dawn. Around sunrise, they proceeded to the A & J Restaurant on Prytania Street, where Sullivan dropped off Hillhouse. Sullivan left to secure the vehicle and to change clothes. He returned a half-hour later on foot, having washed and changed clothes. After drinking beer for a while, Sullivan invited Hillhouse to meet his "wife" (girlfriend), Brenda Wold. The two walked to an apartment on nearby Euterpe Street. While there, the three talked for a while and smoked marijuana. Hillhouse observed the sixteen-gauge shotgun lying on a bed. He also saw a blue, pin-striped vest that accompanied the suit Sullivan had worn earlier at the time of the crime. He asked Sullivan if he might wear it, and Sullivan agreed.
Sullivan and Hillhouse left the apartment, made purchases in a pawn shop, and proceeded to the Play Girl Lounge on Magazine Street. Police were summoned to the bar pursuant to a suspicious persons report. Sullivan had walked outside to check on the stolen vehicle when police officers arrived and realized he fit the description of one of the two suspects who had committed the robbery/homicide. They arrested him outside, entered the bar, recognized Hillhouse as fitting the description of the other perpetrator, and arrested him as well. At the time of the arrest, Sullivan was wearing a gold watch on his left wrist.
Both men were taken to a police station and were questioned separately. Hillhouse confessed to the crime, led the officers back to Magazine Street, and showed them Sullivan's car. They then drove around the area until Hillhouse located the apartment where he had met Wold. The apartment was unoccupied at the time, and officers were left on the scene to await Wold's return. Wold subsequently arrived and consented to a search of the apartment. An officer found the shotgun on the bed where Hillhouse had said it was located and also found both the suit jacket Sullivan had worn and the black vinyl flight bag in which the shotgun had originally been concealed.
At Sullivan's trial, Hillhouse, under a grant of total immunity from prosecution, testified he had willingly gone along with Sullivan's plan to make some quick money. He stated Sullivan had told him of the plan when they met in the Polka-Dot Lounge. Hillhouse asserted he had been shocked when Sullivan, for no apparent reason, shot King.
Lowery positively identified Hillhouse and Sullivan in court as the persons who had committed the armed robbery at the C-Note Lounge. She stated she did not see who had shot King, but after she heard the shot she ducked down behind the bar before looking up to see what had happened. She testified she saw Sullivan holding a shotgun to a customer's head. She identified the jacket taken from Wold's apartment as the jacket worn by Sullivan. Lowery admitted she was unable to identify Sullivan and Hillhouse at a physical line-up conducted on April 30, 1980, but was able *181 to identify both Hillhouse and Sullivan five days later from a photograph of the line-up. She explained her inability to identify the two men initially resumed from fear and nervousness caused by the proximity of the men and the lighting in the room.
A balistics expert testified the slug removed from the body of King had been fired by the shotgun which was found in Wold's apartment. He further testified the empty shell which had been left on the floor when Sullivan reloaded had been ejected from the same gun.
At the time of the trial, neither Legorretta, the bar patron robbed of his watch and wallet, nor Wold, was available. Thus, neither testified at trial.
Sullivan did not testify at the guilt phase of the trial. Against his counsel's advice, the defense elicited testimony from two Angola inmates and one Hunt inmate, all of whom had been incarcerated at the Orleans Parish Prison during the time Sullivan and Hillhouse had been there. The testimony concerned allegations that Hillhouse had been beaten by police and forced to confess to the crime and to implicate Sullivan. On rebuttal, the state recalled Hillhouse, who testified he had not been beaten or forced to confess and the injuries he had sustained while in custody had resulted from falls occurring during epileptic seizures.
The jury found Sullivan guilty as charged of first-degree murder, in violation of La.Rev.Stat. § 14:30(A)(1).[1] The next day, the penalty phase of the trial was conducted. Against the advice of counsel, and after a hearing in chambers, Sullivan insisted on testifying. He told the jury the death penalty was warranted under the circumstances and requested the jury to recommend it. At the conclusion of the proceeding, the jury recommended the death penalty.
After several post-verdict motions and two prior remands by this Court for evidentiary hearings on motions for a new trial, Sullivan appeals his conviction and sentence, asserting numerous assignments of error.

II.
Sullivan first contends the state withheld exculpatory material he had sought when it failed to provide him with a copy of the initial police report containing a description of both perpetrators. This, he contends, deprived him of a fair trial. Sullivan asserts there is a significant difference between the description of the perpetrator who wielded the shotgun given by bartender Stephanie Lowery to the investigating officers and the appearance of Sullivan at the time of his arrest.
The initial police report contains seven pages and the material to which Sullivan refers is on page four where the reporting officer put a brief description of the perpetrator. In addition to writing the estimated height, weight, age, race, and gender, the officer checked off spaces next to general characteristics. One check indicated "straight" hair. Another indicated "shoulder" length. In the area for facial hair description, the officer checked "mustache." Sullivan contends he had "shortish curly hair and no mustache ... when he was arrested only hours after the crime was committed." Sullivan maintains these check mark general description factors are exculpatory and should have been disclosed.
The state is required to provide to the defense any information in its possession which is favorable to the accused and is material to guilt. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This, of course, includes exculpatory and impeachment information and the "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, *182 3383, 87 L.Ed.2d 481 (1985); see also State v. Knapper, 579 So.2d 956, 959 (La.1991).
The evidence in this case does not rise to the level of materiality found in Knapper. Assuming Lowery was the sole source of information upon which the officer had based his initial report, the evidence in the initial report has limited impeachment value. Lowery was able to identify Sullivan, both in court and from a photograph of the line-up. It is true that Lowery's identification of both Sullivan and Hillhouse was open to question because of her inability to identify them at the physical line-up and because she admitted to having chosen "in her mind" subjects other than Sullivan and Hillhouse. Notwithstanding the damage to Lowery's testimony regarding the line-up identification, her in-court identification may have independent criteria for reliability. See State v. Winn, 412 So.2d 1337 (La.1982); State v. Stewart, 389 So.2d 1321 (La.1980).
In addition, Lowery's inaccurate description of the gunman did not directly contradict the testimony of Hillhouse. Hillhouse's credibility, albeit qualified by his deal with the state, would not have been damaged by a revelation that Lowery had given an imprecise description of the gunman. At most, Lowery's own credibility would have been further weakened, diminishing the value of her corroborative testimony.
Such a reduction in her corroborative value would not have interjected a reasonable doubt which otherwise had not existed. Unlike the situation in Knapper, supra, Hillhouse's testimony had other sources of corroboration. The murder weapon was found in the apartment shared by Sullivan and his girlfriend; the suit jacket worn by defendant during the robbery and killing was also found there; the gold watch allegedly taken from Legorretta was found on defendant's wrist when he was arrested later that day; and, the two men were arrested in close proximity later that day. In light of this supporting and corroborating evidence, a further weakening of Lowery's testimony would not have affected the jury's reliance on the testimony of Hillhouse. We conclude, under the Bagley standard, the check marks and brief description contained in the initial police report were not material to guilt and could in no way have created a reasonable doubt.
Sullivan also suggests the information was of "indirect materiality." He asserts Lowery's description of the killer gives reason to pursue his and trial counsel's original speculation, otherwise unsubstantiated, that a man named William O. Williams a/k/a George Simp a/k/a "Cookie" actually killed Joseph King.[2]
This argument is without merit. Despite the assertions of trial counsel that he would have investigated further had he had the description, it is clear that at the time of the killing of King the description given by Lowery does not fit a contemporaneous photograph of Williams. In Exhibit D-3, a photograph of Williams taken 10 days after the C-Note robbery and homicide, Williams has dark, curly, collar-length hair, a thick moustache, and a goatee. The goatee and moustache are distinctive characteristics not easily missed. Additionally, Williams's hair cannot be described as straight or shoulder-length. It is not likely, then, that Williams in April 1980 could have been confused with Sullivan.
Assertions that the existence of an imprecise description of the gunman from Lowery would have resulted in the discovery of evidence implicating Williams as the real killer, based as they are on hearsay, amount to no more than unfounded speculation. Absent independent evidence directly linking Williams to the crime, Sullivan cannot show a reasonable doubt now exists with respect to his guilt.

III.
Sullivan next contends his trial counsel rendered constitutionally ineffective assistance at the guilt phase of the trial. He raised the issue first in a pro se *183 motion for a new trial and subsequently by appellate counsel's motion to remand. He now maintains the discovery in the course of the Brady presentation of the previously unknown evidence of Williams's involvement establishes what a thorough preparation of the case might have revealed. He asserts the state's suppression of the material sought was initially responsible for the failure to present the evidence, but, to the extent this failure was not attributable to the asserted Brady violation, responsibility must be charged to trial counsel's failure to prepare and investigate the case. He charges counsel met with him only three times before trial for about three hours; he did not interview, either personally or through an investigator, any witnesses on the state's witness list; and he made no effort to obtain medical records that might document the injuries suffered by Hillhouse while in police custody.
At the outset, we note
[w]hen a claim of ineffective assistance of counsel is raised on appeal, the issue is generally referred to post-conviction proceedings in which both sides can introduce evidence and the validity of the claim can be properly determined. A narrow exception to this general rule of deferring ineffective assistance claims to post-conviction proceedings has been recognized when "the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy."
State v. Wille, 559 So.2d 1321, 1339 (La. 1990) (quoting State v. Ratcliff, 416 So.2d 528, 530 (La.1982)). Given the extensive evidentiary hearings conducted in this case to date, we believe the record discloses all the evidence required to reach a decision and therefore we will not refer the issue to post-conviction proceedings.
To establish a claim of ineffective representation, "the defendant must [first] show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). In other words, a defendant must demonstrate that counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Next, the defendant must show his counsel's deficient performance prejudiced his defense by depriving him of a fair trial, that is, "a trial whose result is reliable." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. The inquiry is whether, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. 466 U.S. at 695, 104 S.Ct. at 2068.
As revealed in the evidentiary hearings, Sullivan's trial counsel, Joseph Meyer, had taken over the case from his prior counsel, Robert Zibilich, who had personality problems with Sullivan. Zibilich had represented Sullivan for nearly two years, had made extensive pre-trial preparations, and had completed everything procedurally. Meyer's preparation for the trial, therefore, would not have been as extensive as would have been required otherwise.
Meyer testified that the principal witnesses for the state were Hillhouse and Lowery. Hence, he concentrated his efforts on destroying their credibility. He did obtain a photograph of Williams and had spoken with an A & J Restaurant waitress who would have testified she had seen defendant, Hillhouse, and Williams together at the restaurant. Meyer chose not to put the waitress on the stand because her testimony corroborated that of Hillhouse by placing the two men together on the morning of the murder.
Sullivan also alleged his girlfriend, Brenda Wold, should have testified and her testimony would have been to the effect that she and Sullivan had been together at her apartment at 7:15 a.m. when Hillhouse arrived there wanting to speak with Sullivan; Hillhouse had asked her if he could leave his flight bag there while he was offshore; Sullivan had said he would meet Hillhouse *184 at the A & J Restaurant; and she had written letters to this effect in April 1980. In fact, Wold was unavailable to testify because she was in Puerto Rico at the time. In 1984, at one of the hearings on defendant's motion for a new trial, Wold stated she had, at Sullivan's direction, falsified the letters. She testified she had known these to be lies and would never have testified to them at trial. Her version of the events the morning of the killing are directly corroborative of Hillhouse's testimony and would have been extremely beneficial to the state.
Meyer was able, through cross-examination and argument, to cast doubt on various aspects of the state's case. He stressed the "sweetheart" deal Hillhouse had received from the state and how a snitch would have said anything in return for avoiding a certain second degree murder conviction. He suggested Hillhouse may have been the killer. As suggested by Sullivan, he also presented the testimony of the three prisoners who testified Hillhouse was beaten in order to obtain a confession. Meyer also effectively cast suspicion on the source of the gold watch allegedly taken during the robbery and found on defendant's wrist at the time of his arrest. Nevertheless, while Meyer was able to impeach Lowery's identification testimony, he was never able to discredit the testimony of Hillhouse.
We acknowledge this case was plagued by the unwillingness and unavailability of various key witnesses, namely Legorretta and Wold. It is abundantly clear, however, that had these two witnesses testified the state's case would have been stronger rather than weaker. Sullivan was actually in a more desirable position fighting a weaker case than he would have been attempting to fight a stronger one. We conclude Sullivan has both failed to establish even one error on the part of his trial counsel under the Strickland standard and suffered no prejudice at the guilt phase of the trial as a result of anything his counsel either did or failed to do.

IV.
Sullivan next asserts the jury was given an instruction on specific intent which required it to presume such intent on the facts of this case. The instruction thus, according to Sullivan, unconstitutionally shifted the burden of proof to the defendant, in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Sullivan focuses on the portion of the charge in which the trial judge provided an example for the jury. The judge stated:
An [intent] to kill or inflict great bodily harm may be inferred from the facts and circumstances of a homicide.
A specific intent to kill would also be implied in any deliberate cruel act consciously committed by one person against another; if, for instance, a man armed with a deadly weapon should suddenly, with little or no apparent cause o[r] provocation, kill another, the law would presume that such a killing was deliberate and intentional and done for the purpose of killing or inflicting great bodily harm.
Trial transcript, vol. 3, p. 573. Sullivan contends the charge becomes less and less permissive as it progresses, concluding in a mandate to the jury that it, too, must presume intent in this case. He also asserts the remainder of the charge does nothing to counteract the shifting of the burden of proof and the error is not harmless on this evidentiary record.
A jury instruction which creates a presumption of specific intent violates the requirement of the due process clause of the 14th Amendment that the state prove each element of a crime beyond a reasonable doubt. Sandstrom, supra, at 513, 99 S.Ct. at 2453, 2459; see also State v. Hamilton, 478 So.2d 123, 128 (La.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). Sandstrom violations, however, are subject to the harmless error standard enunciated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), i.e., whether it appears beyond a reasonable doubt that the error complained of did not contribute to the *185 verdict obtained. Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991). It is crucial "to ascertain from the trial court's instructions that the jurors, as reasonable persons, would have considered the entire trial record, before looking to that record to assess the significance of the erroneous presumption." Ill S.Ct. at 1894.
Taken alone, the presumptive example in the jury charge may so narrow the jurors' focus as to leave it questionable that they looked to evidence other than that establishing the predicate before inferring specific intent. The trial judge, however, clearly instructed the jury to consider the "facts and circumstances of [the] homicide," before inferring the intent to kill or inflict great bodily harm. In addition, the judge stated specific intent would be implied when a person "consciously commit[s]" "any deliberate cruel act" before reciting his presumptive example. The tone of the instruction is that only after the jury has considered all relevant facts and circumstances presented to them, and then found the facts establishing the presumption, may the jury infer specific intent existed to kill or inflict great bodily harm. Under the court's charge on specific intent, read in its entirety, those circumstances considered by the jury included the finding that defendant had acted "consciously" and "deliberate[ly]." In this light, a reviewing court could readily find a reasonable juror would have looked to other evidence bearing on the fact subject to the presumptive example, i.e., intent to kill or inflict great bodily harm.
Unlike the evidence in Yates, and more similar to the evidence in Hamilton, the evidence in this case clearly indicates Sullivan, from a short distance away, deliberately pointed the shotgun at the victim's chest and fired. This evidence overwhelmingly supports finding beyond a reasonable doubt Sullivan had the specific intent to kill or inflict great bodily harm. There is no evidence to suggest the shooting was accidental or unintentional.
Because the evidence enables us to determine beyond a reasonable doubt the verdict resting upon it would have been the same in the absence of the presumption given by the trial judge, we conclude the instruction on specific intent, even if erroneous, did not contribute to the jury's verdict. Chapman, supra; State v. Gibson, 391 So.2d 421 (La.1980).

V.
Sullivan next argues the jury instruction on reasonable doubt undermined the level of assurance in the outcome of both the guilt phase and the penalty phase of the trial required by the due process clause, in violation of Cage v. Louisiana, 498 U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The state concedes the charge was essentially the same as the charge found to be improper in Cage.[3] The question for our resolution, therefore, is whether it appears beyond a reasonable doubt that the erroneous instruction did not contribute to the jury's finding of guilt. See State v. Cage, 583 So.2d 1125 (La.), cert. denied, 502 U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991). Compared to Cage, *186 Sullivan asserts, the evidence of guilt in this case is not overwhelming.
We find Sullivan's assertions without merit. Despite Sullivan's best attempts to characterize the state's case as a "chain of weak links," the testimony of Hillhouse fingering Sullivan as the leader and triggerman remains unrefuted, even in light of the deal given him in exchange for his testimony. Whatever the weight given Lowery's identification of Sullivan in the photograph of the line-up and in her identification of Sullivan at trial, other evidence, albeit circumstantial, corroborates Hillhouse's version of the facts. The murder weapon, the flight bag, and the suit jacket worn by Sullivan during the crime were later found at the apartment shared by Sullivan and Wold. It was to this apartment that Sullivan had brought Hillhouse to meet his "wife" the morning of the murder.
The evidentiary record clearly supports a finding that the erroneous instruction was harmless beyond a reasonable doubt. See Chapman, supra; Gibson, supra. In light of this evidence, the impact of the erroneous instruction could not have affected the jury's deliberation as to Sullivan's guilt. Given our disposition of the death sentence recommended by the jury, see infra at section XII, it is unnecessary to resolve the challenge of the erroneous instruction as it applied to the penalty phase of the trial.[4]

VI.
Sullivan next argues the state's opening statement at the penalty phase and the jury instructions in the penalty phase erroneously suggested to the jury that a death penalty is automatic upon a finding of an aggravating circumstance and did not clearly indicate such a finding merely authorized a jury to consider the appropriateness of the death penalty. He asserts the prosecutor misstated the applicable law and the judge's instructions did not alleviate the problem by providing a clear and unambiguous statement of the law and the jury's responsibilities. Sullivan then concludes this requires vacating the death sentence. Because of our disposition of the death sentence, see infra at section XII, we find it unnecessary to address this issue.

VII.
Sullivan contends that in the course of voir dire the trial court first discouraged certain questioning and then refused to allow defense counsel to examine fully the prospective jurors relative to their unwillingness to return a death penalty. He argues the trial judge refused to allow his counsel sufficient latitude necessary to explore fully the attitudes and opinions of those prospective jurors who initially declared to the prosecutor an inability to return a death penalty for religious reasons. He contends he was denied his right to a full voir dire and the state benefitted from more challenges than it was entitled as well as from a pro-death jury.
A defendant's right to an impartial jury prohibits the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). Currently, the standard for determining whether a prospective juror may be excluded for cause because of his views on the death penalty is "whether the juror's views [on capital punishment] would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); see also La.Code Crim.Proc. art. 798. The exclusion of potential jurors must be limited to those who are "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings" and to those whose views prevent them from making an impartial *187 decision on the question of guilt. Witherspoon, 391 U.S. at 523 n. 21, 88 S.Ct. at 1777 n. 21; State v. Copeland, 530 So.2d 526, 532-33 (La.1988).
When a juror is challenged for cause because of his answers concerning the death penalty, defense counsel must be given the opportunity to traverse the juror for rehabilitation. State v. David, 425 So.2d 1241, 1249 (La.1983). A full review of the voir dire reveals that at no time was defense counsel ever prevented from attempting to rehabilitate any of the fifteen jurors who had expressed unwillingness to impose the death penalty. The only questions for the trial court were whether the juror would automatically vote against the death penalty regardless of the facts or circumstances presented at trial and whether the juror's attitude toward the death penalty would have prevented him from making an impartial decision as to the defendant's guilt. State v. Celestine, 443 So.2d 1091 (La.), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1983). Under that standard, the trial court properly excluded the prospective jurors.
Sullivan also asserts the trial court erred in excluding jurors who could have been fair and impartial on the issue of guilt despite their predisposition against the death penalty. This contention is meritless. Exclusion of prospective jurors who are properly excluded under Witherspoon from the jury that decides guilt or innocence in a bifurcated trial does not violate a defendant's 6th Amendment rights. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). We have previously rejected the notion that so-called death qualified jurors are conviction-prone. State v. Ward, 483 So.2d 578 (La.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986); State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).

VIII.
Sullivan maintains the prosecutor, in his rebuttal, improperly commented on Sullivan's failure to testify, thus violating his right against self-incrimination. A trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly to... [t]he failure of the defendant to testify in his own defense...." La.Code Crim. Proc. art. 770(3). See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (references to a defendant's invocation of 5th Amendment right to silence are unconstitutional). Not all purported indirect references, however, require that a mistrial be ordered. State v. Johnson, 541 So.2d 818, 822 (La.1989).
In the remark at issue, the prosecutor argued
is it coincidental that [Hillhouse] was arrested with John Sullivan several feet away in the same place? Is it coincidental that Detective Gifford and Detective Myers were called to the Play Girl Lounge, not for one person but for two people and they found Michael Hillhouse and John Sullivan? Is it coincidental that Mrs. [Lowery] talked about two people and not one, two people and at no time and even in Mr. Meyer's argument, and I ask you to consider this, at no time in his argument does he at anytime say that John Sullivan is not in that bar?
Trial transcript, vol. 3, pp. 563-64.
It is clear the remark in this case is not an impermissible reference to Sullivan's failure to take the stand. Taken in the context of the rest of the prosecutor's argument, the statement is a comment on the fact that the state's case was uncontroverted by any evidence presented to the jury. Because the statement does not focus the jurors' attention upon defendant's failure to testify in his own behalf, the argument is without merit.

IX.
Sullivan asserts the state's argument appealed to passion and prejudice at both phases of the trial. In the guilt phase, he complains about the following statement made during rebuttal:
Mr. Meyer said, "Say no to Michael Hillhouse, say no to Michael Hillhouse, we are not going to buy that story." I submit to you, ladies and gentlemen that you *188 shouldn't say no to Joe King, you shouldn't say no to Joe King. He was a person and he had rights just like you and me. He may not have accomplished much in his life and maybe li[k]e Mrs. L[o]wery said, he was a fixture at this bar but he certainly had a right to live. Don't say yes to John Sullivan, good-by, don't say yes to John Sullivan.
Trial transcript, vol. 3, pp. 549-50.
Sullivan argues the worth of the victim is not relevant to whether Hillhouse was worthy of belief. Rather, he argues, the prosecutor's comment implies he knew Sullivan was guilty and had to make the deal to get the more culpable party.
Prior to the quoted statement, the prosecutor had conceded that without Hillhouse's testimony the state had absolutely nothing. He then explained why the state had made a deal with Hillhouse even though his confession to the police evidenced guilt of second degree murder. He noted
I had to make a decision to whether or not the guy went into the C-Note Lounge with this thing and snuffed out the life of Joe King, whether or not I will allow him to go back out there, walk the streets. That's a decision I had to make.
Trial transcript, vol. 3, p. 549.
In this context, the statement to which Sullivan now objects, neither improperly refers to evidence outside the record developed at trial nor vouches for the credibility of the witness. See State v. Smith, 554 So.2d 676 (La.1989). In addition, the statement does not inject an extraneous issue into the trial. The bargain made with Hillhouse in exchange for his testimony was a prime focus of defense counsel's closing argument. While the statement may have approximated a victim impact statement made during the guilt phase of the trial, it was clearly not outside the scope of rebuttal argument.
Sullivan also objects to a statement made by the prosecutor during the penalty phase of the trial. Given our disposition of the penalty phase of the trial, see infra at section XII, we find it unnecessary to reach the issue.

X.
Sullivan contends, in a footnote in his brief, that "the cumulative effect of [the] violations of [his] rights was a denial of due process and fundamental fairness." He asserts the record is replete with examples of the trial court interrupting and curtailing examination by defense counsel, engaging in examination of witnesses in a manner which would be objectionable if done by counsel, and interposing objections where the prosecution failed to do so. While he concedes "many of these practices may not be error in each instance," Sullivan maintains "the cumulative effect may well have been prejudicial."
We disagree. A thorough review of the record reveals no pattern of abuse by the trial court. In fact, the court, in some instances, interrupted in an effort to assist the defense. That the trial, from voir dire to the return of the verdict, lasted only one day is not significant. The jury was sent to deliberate at 9:30 p.m. and returned a verdict at 10:26 p.m. The facts of the case were neither complex nor extensive. Thus, a prolonged period of deliberation could not have been expected. Sullivan provides no testimony from jurors that they were too tired to function or any evidence they had sought a recess. In short, there is nothing in the record which would support a finding that the guilt phase of Sullivan's trial was fundamentally unfair or violated his right to due process of law.

XI.
Because this is a capital case, we will address Sullivan's other, unbriefed, assignments of error, raised by his previous counsel as well as one raised by Sullivan pro se.

A.
Sullivan contends the trial court erred in allowing a police officer to testify Wold had executed a consent to search form when neither the original of the form nor Wold herself was available.
*189 If Sullivan is alleging no consent to search was given and, therefore, the search was unlawful, such an argument, as well as evidence establishing lack of consent should have been presented by Sullivan at the hearing on the motion to suppress. State v. Scott, 307 So.2d 291 (La.1975). The validity of the consent to search form was not an issue at trial. See La.Code Crim.Proc. art. 703(F). In any event, Wold testified in 1984 she had consented to the search.
Sullivan appears to be making a best evidence or hearsay argument, as counsel did object at trial to any mention of the consent to search form on grounds it was a photocopy and the person who had executed the document was not available to be cross-examined. This argument is meritless. The prosecutor stated the original consent form was unavailable, and Wold was, at the time of trial, in Puerto Rico. Because the photocopy is the substantial equivalent of an original, its admission did not violate the best evidence rule (at that time La.Rev.Stat. § 14:436) in the absence of a showing the copy did not accurately reflect the original. State v. Stuart, 344 So.2d 1006 (La.1977). Defense counsel, having an opportunity to cross-examine the officer who provided the consent form, made no showing that the copy did not accurately reflect the original.

B.
Sullivan asserts the trial court erred in refusing to admit into evidence a prior statement of Hillhouse. The record reflects that on recross Hillhouse admitted making the statement and that it was inconsistent with his trial testimony. When a witness admits making a prior inconsistent statement, the prior statement is not independently admissible. La.Rev.Stat. § 15:493; State v. Williams, 445 So.2d 1171 (La.1984). The trial court did not err in so concluding.

C.
Sullivan's original appellate counsel briefed the issue raising the contention there was insufficient evidence to sustain a conviction for first degree murder. Rather, he maintains, the evidence at most supported a conviction for second degree murder. He argues the state failed to prove he had possessed the specific intent to kill or inflict great bodily harm upon the victim. He indicates Hillhouse testified there had been no discussion of violence. He also asserts Lowery had her back turned at the time of the shooting and could not have seen exactly what transpired, despite attesting that the victim had neither reached for a weapon nor provoked the attack.
The state was required to prove, beyond a reasonable doubt, Sullivan killed King and had the specific intent to kill him or to inflict great bodily harm while engaged in the perpetration or attempted perpetration of an armed robbery. La.Rev.Stat. § 14:30(A)(1). An armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another by use of force or intimidation and while armed with a dangerous weapon. La.Rev.Stat. § 14:64.
The evidence clearly supports a finding the killing was committed during the course of an armed robbery. Hillhouse testified Sullivan entered the bar while armed with a sawed-off shotgun with the intent to commit an armed robbery. After asking Hillhouse if he were ready, Sullivan got off the stool, took a couple of steps back, pulled the shotgun up, and shot King. Sullivan then reloaded the gun, told everyone it was a holdup, and demanded all the money. Both Lowery and Hillhouse testified Sullivan, while holding the shotgun to the head of Legorretta, robbed him of his wallet and watch. Sullivan further demanded Lowery hand over the cash from the register. On these facts, there is no doubt the "armed robbery was an immediate concomitant of the murder and formed, in conjunction with it, one continuous transaction." State v. Williams, 383 So.2d 369, 372 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981).
These facts also support a finding Sullivan had possessed the intent to kill or to inflict great bodily harm upon the victim. *190 The deliberate pointing and firing of a shotgun at a victim at point-blank range is sufficient to establish beyond a reasonable doubt the element of specific intent to kill or to inflict great bodily harm. State v. Neslo, 433 So.2d 73 (La.1983).
Viewing all the evidence in the light most favorable to the prosecution, a rational fact-finder could have found, beyond a reasonable doubt, Sullivan had killed King with the specific intent to kill or inflict great bodily harm while engaged in the perpetration of an armed robbery. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Hence, this argument is without merit.

D.
Sullivan asserts the evidence is insufficient to sustain a jury finding that the killing was especially cruel, atrocious, or heinous and the death penalty cannot be based on a system of double-counting, where the armed robbery both elevates the crime to first degree murder and also sustains the imposition of the death penalty. Given our disposition of the penalty phase of the trial, see infra at section XII, it is unnecessary to address these contentions.

E.
Sullivan maintains the trial court erred in denying his first motion for a new trial filed on June 10, 1982, and the pro se supplement filed on June 17, 1980. We have already discussed all issues implicated by this motion. Further discussion is, therefore, unnecessary.

F.
In an unbriefed assignment of error, filed pro se, Sullivan alleges the transcripts have been tampered with, altered, and padded with testimony that never existed. A review of the record in the case reveals no evidence of tampering. This argument is meritless.

XII.
Finally, Sullivan contends his trial counsel rendered constitutionally ineffective assistance at the penalty phase of the trial. We previously remanded for an evidentiary hearing on this issue. State v. Sullivan, 559 So.2d 1356 (La.1990). On remand, the court ruled orally that while defense counsel's failure to prepare for the penalty phase of the trial was wrong, and that "anytime ... a defendant is charged with first degree murder, defense counsel has to prepare on the basis that a guilty verdict may be returned[,]" nonetheless, based upon the circumstances of the crime, "the result would not have changed if all the other evidence had been admitted." Hence, the court concluded Sullivan suffered no prejudice as a result of his trial counsel's failure to prepare.
Sullivan asserts his trial counsel's failure to provide effective assistance was total and complete because nothing whatsoever was done to investigate, to evaluate, or to prepare a mitigation defense.[5] He contends the failure to prepare and present a mitigation defense amounted to a breach of counsel's duty to conduct a reasonable investigation, including an investigation of his background for possible mitigating evidence.
In evaluating a claim of ineffective assistance of counsel during the penalty phase of a capital case, we must first determine whether a reasonable investigation would have uncovered mitigating evidence. State ex rel. Busby v. Butler, 538 So.2d 164, 169 (La.1988). If such evidence could have been found, we must consider whether counsel had a tactical reason for failing to put the evidence before the jury. Id. Where mitigating evidence is not *191 presented to the jury because of counsel's tactical choice, a defendant must overcome the strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id. If it is determined counsel's actions were not taken for tactical reasons or if the tactical reasons were unreasonable, we must then assess whether the defendant suffered actual prejudice from counsel's ineffectiveness. Id. As we have previously noted, "[t]he benchmark ... for judging any such claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Busby, supra, at 167 (citing Strickland, supra, 466 U.S. at 686, 104 S.Ct. at 2063).
We note at the outset Sullivan's trial counsel, in the evidentiary hearing, candidly admitted he failed to prepare for the penalty phase of the trial because he "arrogan[tly]" thought the jury would return only a second degree murder conviction, thereby precluding a penalty phase.[6] Given the facts of this case, we believe his assumption to have been unreasonable. We agree with the court which conducted the evidentiary hearing that any time a defendant is charged with first degree murder, defense counsel must prepare for the eventuality that a guilty verdict may be returned. See Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.), cert. denied, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985) (attorney who fails to make preparation for penalty phase deprives client of reasonably effective assistance of counsel).

A.
We conclude in this case a reasonable investigation would have uncovered mitigating evidence. Counsel would have been able to put before the jury the fact Sullivan was raised in an abusive, alcoholic, often brutal environment. Sullivan's mother and sisters, had they been contacted, would have testified at length and corroborated the details of Sullivan's turbulent childhood. They also would have told the jury they loved him and pleaded with the jury to spare his life.
Further inquiry by Sullivan's counsel would have proved the existence of mental illness and explained its significance. The records of Sullivan's 1968 hospitalization for schizophrenia were readily accessible at the time of the trial. Those records would have provided the basis for current evaluations and expert testimony to confirm the continued existence of the disease and to interpret to a jury how it continues to affect him today. While the jury heard from Sullivan that he had once been diagnosed as schizophrenic, there was no elaboration by experts as to the significance of the diagnosis, nor was there an explanation made to the jury that while Sullivan may appreciate the difference between right and wrong at an intellectual level, his disease prevents him from integrating the knowledge to the other, emotional side of his personality. Experts who testified at the evidentiary hearing indicated that in stressful situations Sullivan disassociates into a fantasy world and cannot differentiate fantasy from reality. Certainly this is the type of evidence contemplated by La. Code Crim.Proc. art. 905.5(e), and it is evidence readily available had any reasonable investigation been undertaken.

B.
We next conclude there can be no tactical reason for defense counsel's failure to put this evidence before the jury. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Busby, supra, at 171 (citing Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)).
Counsel's frank admission in the evidentiary hearing that he conducted no investigation whatsoever because of his abiding faith in his ability to obtain nothing more severe than a second degree murder conviction negates any assumption trial strategy motivated the decision to keep this evidence *192 from the jury. Rather, it was counsel's complete failure to perform his duty to investigate that resulted in the jury's not having the benefit of the mitigating evidence, evidence which was both relevant and admissible. See Lockett v. Ohio, 438 U.S. 586, 605-06, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Under these circumstances, then, we conclude the level of representation Sullivan received at the penalty phase of the trial amounted to constitutionally ineffective assistance of counsel.

C.
Having concluded the assistance provided Sullivan at the penalty phase was constitutionally ineffective, we must still determine whether, but for counsel's errors, there is a reasonable probability the result of the proceeding would have been different, i.e., whether Sullivan suffered actual prejudice as a result. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. We respectfully disagree with the trial court's conclusion the result would not have been different had the jury heard the evidence in mitigation.
In Busby, supra, we found if the mitigating circumstance of mental impairment had been established, the degree of likelihood a jury would not have recommended a death sentence is sufficient to undermine confidence in the outcome of the penalty phase of the trial. Id. at 172. Such evidence has the potential to change totally the evidentiary picture by altering the causal relationship which can exist between mental illness and homicidal behavior. Busby, supra, at 173. "Psychiatric mitigating evidence not only can act in mitigation, it also can significantly weaken the aggravating factors." Id. (citing Middleton v. Dugger, 849 F.2d 491 (11th Cir.1988)) (in turn citing Huckaby v. State, 343 So.2d 29, 33-34 (Fla.), cert. denied, 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977)).
We believe the testimony sought to be presented to the jury in the present case, viz., that Sullivan was diagnosed as a paranoid schizophrenic, a disease which continues to affect his judgment and his actions, that he was severely abused as a child, and that his mother and sisters love him and would plead with the jury to spare his life, could, with reasonable probability, have altered the outcome at the penalty phase of the trial. This case is simply not distinguishable from Busby, where the murder involved premeditation, luring the victim into the woods, shooting him in the back, stripping the body of a watch and a wallet, and covering the body in an attempt to hide it. We determined there the jury was deprived of information by which it could make the life or death decision in a rational and individualized manner. The jury in this case was deprived of similarly important information through the inaction of defense counsel. Since Sullivan suffered prejudice as a result of his counsel's ineffective assistance, he is entitled to a new sentencing hearing wherein the evidence in mitigation he seeks to introduce, and presumably rebuttal testimony by the state, is heard by the jury.

XIII.
For the foregoing reasons, we affirm the defendant's conviction of first degree murder. We vacate the sentence of death and remand to the trial court for a new sentencing hearing.
CONVICTION AFFIRMED. SENTENCE VACATED. REMANDED FOR NEW SENTENCING HEARING.
CALOGERO, C.J., concurs in the result.
DENNIS, J., dissents with reasons.
MARCUS, J., dissents in part and concurs in part and assigns reasons.
MARCUS, Justice (dissenting in part and concurring in part).
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the test for ineffective assistance at the penalty phase is whether there is a "reasonable probability" that absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. In the present case, the jury was made aware that defendant had been previously *193 diagnosed as a schizophrenic. Given the circumstances of this case, I do not believe that additional evidence on this issue would have had a reasonable probability of changing the jury's recommendation. Accordingly, I respectfully dissent from the majority's opinion insofar as it vacates defendant's death sentence and remands for a new sentencing hearing, but concur with the majority opinion insofar as it affirms defendant's conviction of first degree murder.
DENNIS, Justice, dissenting.
I respectfully dissent from the portion of the opinion affirming the conviction.
This case presents again the question of whether the harmless error standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) applies to a jury instruction that violates the Fourteenth Amendment and the principle of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) because it fails to clearly and effectively inform each reasonable juror that the state must prove every element of the criminal offense with which the defendant is charged beyond a reasonable doubt.
The United States Supreme Court has not resolved this question in a square holding, but it has given clear signals that such an error cannot be harmless. See discussion in State v. Cage, 583 So.2d 1125, 1130-36 (La.1991) (Dennis, J., dissenting) and authorities cited therein.
Moreover, the majority failed to properly apply the harmless error standard in the present case. The majority does not seriously attempt to apply the actual holding of Chapman but instead lapses into what is actually nothing more than a Jackson v. Virginia sufficiency of evidence review. Id. at 1136-37.
Finally, the majority has again defaulted completely in its duty to address the question of whether a reasonable doubt instructional error can be harmless under our state constitution and laws. Id. at 1137-38.
In fact, the decision of the United States Supreme Court in Cage v. Louisiana, 498 U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) and this court's derelictions of duty in implementing it have now produced a sad state of affairs. Although this court at one time consistently reversed convictions based on the type of incorrect reasonable doubt instruction given to the jury in this case, see State v. Vessell, 450 So.2d 938 (La.1984); State v. McDaniel, 410 So.2d 754 (La.1982); State v. Mack, 403 So.2d 8 (La.1981); State v. Moffett, 127 La. 760, 53 So. 982 (1911); State v. Ardoin, 49 La.Ann. 1145, 22 So. 620 (1897), and although the United States Supreme Court has since declared such an instruction unconstitutional, Cage v. Louisiana, 498 U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), it is now becoming clear that this court will always declare such an error to be harmless, so that, as a matter of fact, all trial judges in Louisiana are now free to give the same incorrect instruction on proof beyond a reasonable doubt that only a few of them mistakenly or obstinately have given in the past. The criminal justice system in Louisiana would have been more just had the U.S. Supreme Court never decided Cage v. Louisiana.
For these reasons, I would reverse the conviction and remand the proceedings for a new trial in accordance with the above.
NOTES
[1] First degree murder is "the killing of a human being: ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery...." La.Rev.Stat. § 14:30(A)(1).
[2] Williams was, himself, killed on May 6, 1980, some three weeks after the homicide at the C-Note Lounge.
[3] The instruction at issue provided

If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal. Even where the evidence demonstrates a probability of guilt, yet if it does not establish it beyond a reasonable doubt, you must acquit the accused. This doubt must be a reasonable one; that is, one founded upon a real, tangible, substantial basis, and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty, raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendant's guilt. If, after giving a fair and impartial consideration to all of the facts in the case, you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable person would seriously entertain. It is a serious doubt, for which you could give good reason.
Trial transcript at 566-68 (emphasis added).
[4] We are confident that a jury instruction such as this one will not be used in future criminal proceedings.
[5] Such a defense is imperative, under the circumstances, because the Louisiana death sentencing provision requires the jury to consider evidence of mitigating circumstances before imposing the death penalty. La.Code Crim.Proc. art. 905.3. One of the mitigating circumstances the jury may consider is that "[a]t the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." La.Code Crim.Proc. art. 905.5(e).
[6] Statements in this context by former counsel are subject to careful scrutiny given they are conducive to accomplishing the original defense goals of trial and sentencing.