STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-435


STATE OF LOUISIANA

VERSUS

QUINT MIRE


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 55143
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Shannon J. Gremillion, Judges.


Amy, J., dissents and assigns written reasons.


SECOND DEGREE MURDER CONVICTION VACATED;
VERDICT OF NEGLIGENT HOMICIDE ENTERED; REMANDED FOR
RESENTENCING; AFFIRM DENIAL OF MOTION FOR NEW TRIAL.

**Burton Paul Guidry**
**Burton P. Guidry and Associates**
**111 Concord Street – Suite B**
**Abbeville, LA 70510**
**(337) 740-0834**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Quint Mire**

**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**Michael L. Barras**
**Assistant District Attorney, Fifteenth Judicial District Court**
**100 N. State Street, Suite 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Quint Mire**

**GREMILLION, Judge.**

Defendant, Quint Mire, was found guilty of second degree murder, a violation of La.R.S. 14:30.1, and obstruction of justice, a violation of La.R.S. 14:130.1. Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for second degree murder and ten years at hard labor for obstruction of justice, with the sentences to run concurrently.

Defendant filed a motion for new trial based on newly discovered evidence, which was denied by the trial court. Defendant now appeals his conviction for second degree murder and argues the appropriate verdict was guilty of negligent homicide. He also contends that the trial court erred in denying his motion for new trial. For the following reasons, Defendant's conviction for second degree murder is vacated, and a judgment of guilty is entered for the lesser included offense of negligent homicide. This matter is remanded for resentencing in accordance with this opinion.

## SUFFICIENCY OF THE EVIDENCE

### *FACTS*

On Wednesday, February 9, 2011, Defendant shot and killed the victim, Julian Gajan, during a hunting trip in the marsh. Gajan's body was found on Saturday, February 12. Defendant denied he shot the victim until February 13, 2011. He then claimed the shooting was accidental; he thought he saw a deer and shot at it three times. He threw the three shotgun shells in a canal.

Defendant claims that the State did not prove the essential elements of second degree murder beyond a reasonable doubt. He asks this court to reverse his

conviction or, alternatively, reduce his conviction to the lesser offense of negligent homicide.

## STANDARD OF REVIEW

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now codified in La.Code Crim.P. art. 821. This standard does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048, p. 1 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

2

However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

Second degree murder is "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). Negligent homicide is "[t]he killing of a human being by criminal negligence," defined as conduct that "amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:32(A)(1), 14:12.

## FACTS

On Wednesday, February 9, 2011, Defendant and the victim made plans to illegally hunt deer in the marsh at Little Prairie. They left in separate boats. Defendant returned to the victim's camp around 2:30 or 3:00 Wednesday afternoon, but the victim did not. Defendant stayed at the camp for a couple of hours, picking onion tops for a gumbo supper he planned to attend that evening.

3

At 9:26 a.m. on Thursday, February 10, Defendant's wife, Suzanne Mire, called the Vermilion Parish Sheriff's Office to report that the victim had left in his boat on the prior day and had not returned. The Coast Guard and a K-9 team from Angola were contacted to assist in a search of the marsh that continued all day on Friday, February 11. Captain Robert Buatt of the Department of Wildlife and Fisheries and Colonel Frith of the Vermilion Parish Sheriff's Office found the victim's body at 2:58 p.m. on Saturday, February 12. Examination of the body showed a projectile hole in the left skull and some small holes in the scarf area with additional possible projectile holes into the jacket area and a buckshot pellet in the neck area. The victim's rifle was found next to his body in the "fire" position with a round in the rifle and additional rounds in the magazine. The rifle appeared to be ready to shoot. The victim had $527.00 cash in his wallet.

Jacqueline Stelly was employed at Stelly's Grocery at the time of the shooting. She recalled asking Defendant what he thought had happened to the victim while the search was in progress. Defendant "looked pretty tired," and told her he thought foul play was involved. She knew Defendant and the victim, but she did not know they were friends.

Gregory Raspberry testified that he had known Defendant since the summer of 2010, and the victim since 1996; he was friends with both men. Mr. Raspberry learned the victim was missing on Wednesday, February 9, 2011. Around 1:00 p.m., he saw Deputy Leger in his car and Defendant and another man in Defendant's truck. When they told him the victim was missing, Mr. Raspberry asked if he could help look for him. Mr. Raspberry got his boat and asked Defendant to accompany him. Defendant declined and Mr. Raspberry left to search alone. Mr. Raspberry never saw Defendant search for the victim.

4

On three prior occasions, Mr. Raspberry stated Defendant said something to him about killing the victim. About a month before the shooting, Mr. Raspberry was in Defendant's camper with him when Defendant said, "You know, we can kill [the victim,] and we can get away with it." On two other occasions, Defendant said "[b]asically the same thing," once in Mr. Raspberry's office trailer and another time in Defendant's camper. No one else was present to hear the comments. Defendant gave no reason for his suggestion.

Mr. Raspberry ignored Defendant's comments; he did not take them seriously. Defendant told Mr. Raspberry "he had fronted [the victim] a hundred crab traps," and the victim had not paid for all of them. Mr. Raspberry admitted at trial that he and the victim had "some disputes" over a woman who was "good friends" with Mr. Raspberry at the time of trial, but who was in a "boyfriend/girlfriend" relationship with him the prior year. He admitted he "had an issue" with the victim.

Brant Herpin testified that he had known Defendant for three or four years and had known the victim about ten years. The last time he saw the victim was Tuesday night, February 8, at Little Prairie. Around 9:00 a.m. on Thursday, February 10, Defendant called Mr. Herpin and said the victim had gone hunting, and that Defendant could not find him. Defendant had to go to Maurice to pen up some sheep, and was unable to look for the victim. He wanted Mr. Herpin to go look for him.

In response, Mr. Herpin went to Little Prairie and used Defendant's boat to look for the victim; he found only the victim's boat. On the way in, he came in "a little too fast" and wrecked Defendant's boat. Defendant "started hollering" at Mr.

Herpin, and they had a confrontation. Mr. Herpin told Defendant that he was "the only one out here looking for him and [Defendant was] standing on the dock."

Captain Buatt received news on February 10 that the victim had been located. However, Defendant called Captain Buatt at 3:30 p.m. saying that was not the case. Defendant said Mr. Herpin had reported that he found the victim picking up decoys, but Mr. Herpin had lied. Captain Buatt testified that he thought Defendant sounded intoxicated during the call because his speech was slurred. Captain Buatt had met Defendant before and recognized his voice during the call. He ordered the search to proceed.

Mr. Herpin actually located the victim's boat but not the victim himself.[1] Mr. Herpin said he spoke to some men in the area working construction who had an airboat. They took him to look through the marsh again. Mr. Herpin felt Defendant was trying to implicate him in the shooting. He and Defendant were friends before the shooting. Mr. Herpin never saw Defendant look for the victim.

Cassie Hardy and her husband spent the weekend prior to the shooting with the victim. She had met Defendant two weekends earlier. Mrs. Hardy and her husband arrived in the Little Prairie area on Thursday night after hearing that the victim was missing. When she spoke to Defendant at the victim's house, he asked, "Wouldn't Brant be the first suspect? He called the search off for three hours which would have gave [sic] him time to move the body." Defendant also opined that the victim could have been killed by coyotes. Ms. Hardy and her husband went in a boat with Richard Verret on Saturday to look for the victim. She never saw Defendant out in a boat searching for the victim.

---

[1]The victim was using "another guy's boat" on February 9, and it was that "guy's boat" Mr. Herpin found.

Brian Debarge knew the victim for about twenty years and Defendant for about six months. Prior to the week of the shooting, Mr. Debarge had asked Defendant to tell the victim he "had a guy wanting to buy five thousand pounds of catfish twice a week." Defendant asked Mr. Debarge if he and his sons could catch them; Mr. Debarge said no, Defendant would have to get with the victim. Defendant asked again two more times; each time, Mr. Debarge said "he needed to talk to [the victim]." When Mr. Debarge was finally able to talk to the victim, he asked if Defendant had told him about the fishing proposal. The victim said Defendant had not. On the day the victim went missing, Defendant told Mr. Debarge "three different stories in about five minutes of what happened with him and [the victim]." He did not explain what those three different stories were.

Defendant's wife, Suzanne Mire, testified in his defense. She had been disabled from bipolar disorder since 1996. She denied that Mr. Debarge told Defendant he had to talk to the victim about permission to catch the fish. On the morning the victim went missing, Suzanne was having difficulty burying a water line. The skies were overcast, and "it was like raining sleet," with "a little bit of hail. . . ." Defendant went to the victim's home to get a maul to help Suzanne dig the line.

Suzanne and Defendant were working at their camp in Little Prairie. Suzanne had bought it with Mr. Raspberry in June of 2010. Defendant made a "[g]reat living" as a sheet metal worker until he hurt his back on the job, possibly in 2005. In May of 2010, he began working as the victim's "fish man, baiting man."

Defendant had known the victim for seventeen or more years. He, Suzanne, and the victim socialized every day. Defendant worked "cleaning fish from sunrise

to dark for [the victim]'s bait" from May to July of 2010; Defendant made $250 from the victim. Defendant decided to buy two new boats and crab traps and fish and crab for a living, using money Suzanne had inherited from her grandfather to start the business. In September 2010, Defendant ordered some crab traps for the victim, whose part of the bill was $2,321.00 according to Suzanne. The victim "was going to pay a little bit off of every crab check that he got . . . . [i]t didn't go that way." However, Suzanne agreed to give the victim additional crab traps in the hopes that he would earn enough money to pay off his debt. The victim still owed $1,100.00 for the crab traps at the time of his death. Suzanne gave the victim $400.00 to fix his truck in February of 2011. Two days before the shooting, Suzanne paid the victim's cell phone bill. She would not have paid either expense if she had been worried about the victim paying for the crab traps.

The victim and Defendant did not often hunt together because Defendant was unable to walk in the marsh due to his back injury. Around Thanksgiving of 2010, the victim stole gas from Defendant's truck. Defendant also thought he stole mosquito spray from Defendant's boat. Defendant further did not like the way the victim sometimes talked to him as if he were a child.

A few days later, the victim arrived at Defendant's leased camp, and Defendant asked him to leave. After exchanging comments, Defendant pushed the victim and again told him to leave. The victim again refused, and "they bounced around, bounced around a little bit" before the victim went "down to the ground." Suzanne stood and watched because she did not want Defendant "to lose his cool[.]" The victim "started crying, 'Quint, please don't hit me. I'm sorry. Please don't hit me.'" Defendant let the victim get up, and the victim walked back to his camp. When the victim returned, Defendant apologized and he and the victim

became closer friends and continued to socialize. The victim stopped talking to Defendant as if he were a child. Shortly after, Defendant and Suzanne gave the victim the crab traps for the "water geography people to use."

On the day of the shooting, Defendant returned home with the maul and told Suzanne "it looked like [the victim] needed a friend and – because he looked upset." Defendant said the victim asked him to go rabbit hunting. Defendant did not tell Suzanne that they were illegally deer hunting because she would have been worried about the boat being confiscated.

Defendant left at approximately 10:45 a.m. Suzanne next saw him between 3:00 and 3:30 that afternoon. Defendant immediately told Suzanne that he could not find the victim. He told her the victim had gone down the canal to look for a raccoon. That night, they went to Sidney Meche's camp, where the victim was living, to eat gumbo. Suzanne did not suspect the story was untrue until the next morning because Defendant did not sleep that night and was very pale the next morning. Defendant "would sit at the table and just look out the window at the water and tears would just come down his eyes." He would not eat, was jumpy, and did not look like himself. Suzanne attributed his unusual behavior to the victim's status as missing.

It was not unusual for the victim to go to the marsh for a while. Suzanne testified she thought the victim had been out because of his recent crystal methamphetamine use. The morning Defendant and the victim went hunting, the victim gave Defendant a little meth; the victim did three hits, Suzanne "hit it," and Defendant used some earlier in the morning.

On February 10, Defendant left their camp at 5:30 to help their son herd sheep. Suzanne called the Vermilion Parish Sheriff's Office to report the victim as

missing and was referred to the Wildlife and Fisheries Department in New Orleans. She was told she could not "call in a missing report if he did not say what time he was coming back and didn't." When Defendant told Suzanne he could not find the victim, Suzanne worried about him because it was cold.

After the victim's body was found on February 12, Defendant told Suzanne he was sorry, and he had accidentally shot the victim when "[h]e took him for a deer." Defendant told her he did not know what to do, and he "just freaked out." She knew of no motive for Defendant to kill the victim. She did not think the shooting was related to the crab traps because they would not get their money if Gajan was dead. She also did not think it was related to the contract to provide fish to Mr. Debarge because Defendant would need the victim's help to fulfill the agreement. Suzanne believed the shooting was an accident.

On February 13, Defendant gave a statement to Detective Sammy Laporte and went with him to the scene of the shooting. Sergeant Anthony Vice of the Vermilion Parish Sheriff's Office testified that Defendant "pointed out the exact area where he was at whenever he fired the three shots at the victim." Sergeant Vice found a wad from a shotgun shell on the ground next to a rifle at the scene and another wad next to the victim. He also found "projectiles, possibly from buckshot that entered into the trees from where the body was located in the same area and direction of where the body was located." Buckshot was recovered from the victim's head and chest during an autopsy.

Defendant testified at trial after waiving his constitutional right to remain silent. He said that he went to the victim's trailer to borrow a maul, and the victim asked him to go deer hunting. He took the maul back to his wife and told her they were going rabbit hunting because deer hunting season was closed.

10

The victim and Defendant met "down the canal . . . where the deer meet, the deer they had killed the night before." They hunted "that dog leg canal" and then went to Pylon Bayou. Defendant crossed the pylons, and the victim "just hopped out the boat and he told me to go around where the canal got kind of wide." He admitted they were poaching deer.

The victim was "pushing" the deer toward Defendant, who got out of the boat several hundred yards from the victim and looked for a tree to get out of the rain. Around the time he found a tree, "a deer had passed." Defendant looked back, saw movement, and fired three shots. He could not determine what caused the movement; he "took it for a deer." Defendant did not know he was shooting at the victim when he fired. He did not think the victim would arrive at that location that quickly. As he walked about ten to fifteen feet toward where he had shot, he saw the victim's shotgun scope and knew he had shot him. Defendant said that he did not kill the victim because of the crab traps or the fish deal.

Many of the cast of characters used drugs. Mr. Debarge "smoked weed all [his] life." He had heard that Mr. Herpin supplied the victim with methamphetamines. Mr. Herpin admitted that he "did drugs" in the past, but he was clean at trial. Mr. Debarge testified that another witness, Richard Verret, was making methamphetamines in the marsh. Defendant took crystal meth around 9:30 or 10:00 a.m. on February 9 before he and the victim left; he testified it gave him energy. Nevertheless, he did not think he was under the influence of the meth at the time of the shooting. The victim's body was positive for amphetamines and cocaine/metabolites.

Defendant shot the victim with a Remington 1187 semiautomatic firearm. He had to pull the trigger each time it was fired. Defendant determined the

11

victim's identity, left the scene, and went to the victim's camp, arriving around 2:30 or 3:00 p.m.

When asked why he did not assist the victim, Defendant testified:

> I always had a fear of dead people since I was a child. I still do now. I will have it till I die. And I had a fear – a crippling fear that took over my body that I never experienced in my life. And I couldn't deal with it. I couldn't touch him.

Q.    You couldn't even get close to him?

A.    No, sir.

Defendant said it did not cross his mind to call someone for help; he felt terrible and was not in his right mind after he saw the victim on the ground. As he was leaving, Defendant saw the shells on the ground, picked them up, and threw them in the boat. At some point, he threw them away, but when asked why, he testified, "I can't answer. I don't know why." He "was scared." When asked why he did not come forward with information, Defendant responded, "I couldn't. I don't know why I couldn't. I just – it was eating at me . . . tearing me up emotionally and physically." He did not want to get anyone else involved, so he said nothing to no one.

On the day after the shooting, Defendant left home around 6:00 a.m., herded sheep and goats with his son, took a shower, and headed home. When he received a call saying the victim had not come home, he called Brant Herpin and told him he could use his boat to look for the victim. Defendant did not go with Mr. Raspberry to look for the victim because Mr. Raspberry's big boat would not start, and his little boat would not carry two people because the water in the pipeline canal was too low. Defendant admitted that he knew where the body was and how to access it at all times. Defendant stayed at the victim's camp with Sidney Meche

while Mr. Raspberry and Mr. Herpin, along with Wildlife and Fisheries personnel, searched for the victim. He told no one about what happened.

Defendant did not recall what he did on Friday morning, February 11; however, he did not search for the victim. Detective Verret interviewed him around 11:30 a.m. Defendant said nothing about the shooting.

On February 12, Defendant lounged around the camp until Suzanne came to tell him the victim's body had been found. He gave another interview to Detectives Laporte and Verret around 9:30 p.m. When asked numerous times if he had accidentally shot the victim, Defendant denied it every time. On Sunday, during an interview around 10:10 a.m., he admitted for the first time that he shot the victim, thinking he was a deer. Defendant took the detectives to the scene. He denied ever suggesting to Mr. Raspberry that they could kill the victim. He testified that he never intended to hurt the victim or to destroy evidence by discarding the shotgun shells.

Defendant testified that he did not know what he was doing, and he had no reason to kill the victim. He went to a store, was around friends, and talked to detectives after the shooting. Although Defendant said nothing to anyone about what had happened, he said he wanted to tell someone and "was trying to." He did not know why he gave police every bit of information about the accident except the fact he shot the victim. Defendant believed he was guilty of negligent homicide. He knew he would go to jail even though it was an accident.

As to the fight, Defendant had been angry with the victim for stealing gas from his truck, but he did not want to hurt or kill him. He threw the victim on the ground because the victim was swinging at him. They met shortly thereafter and

13

shook hands, apologized, and hugged. They never argued before or after that incident.

Regarding the fishing contract, Defendant testified that he and the victim talked about it two or three times. He believed "[t]here's no way one man or two men could catch five thousand pounds of fish a week, plus crab three, four days that same week."

As to the crab traps, the victim was to pay Suzanne because her money was involved. Defendant never asked the victim for money for the traps or for anything else. He harbored no ill will toward the victim and had no reason to shoot him. The victim "wanted to get away" on the morning of the shooting. Defendant made "a terrible mistake" with which he now has to live.

In his taped interview on Saturday, February 12, 2011, Defendant first said that he had last seen the victim around 10:30 or 11:00 a.m. on Wednesday when he went to get the maul. They agreed to go hunting, and the victim left in someone else's boat. Defendant went looking for him but could not find him. Around 2:30 or 3:00 p.m., it started raining, and Defendant headed for home, picking up crab traps on the way. He went to the victim's house, used the bathroom, went home, and changed clothes. That night, he went to the gumbo supper until around 8:30 p.m.

When he was told the victim had been shot, Defendant replied he was "sorry to hear that." He told Detective Laporte, "I'd never shoot nobody [sic]." The detective asked Defendant if he could have shot the victim accidentally, and defendant said no. Detective Laporte noted Defendant's nervousness, dilated pupils, dry mouth, and pulsing neck during the interview. Defendant said those symptoms were from the gumbo he ate the previous night. When Detective Verret

14

pled with Defendant to tell them if he had accidentally shot the victim, Defendant responded, "I can't tell you something I didn't do."

The next day, Defendant called Detective Laporte and admitted that he shot the victim, thinking he was a deer. He and the victim started out in separate boats, then the victim parked his and got in Defendant's boat. Defendant dropped him off near a deer stand and moved his boat to another location. Defendant got out of the boat on a levee and got under a tree to get out of the rain. A deer went by, and Defendant saw further movement. He thought it was another deer, so he fired three times through the bushes. He did not think the victim could get from where he left him to where the shooting occurred in the time that elapsed. The victim was wearing clothing that looked like a deer and was about forty yards away when Defendant shot.

Based on what was at the scene and what Defendant advised, law enforcement reenacted the incident a few days after the shooting. Sergeant Vice testified that the shooting "possibly" could have occurred the way Defendant said it did. However, he did not interpret what he saw during the reenactment as a deer; he "saw a person." Weather conditions at the shooting and the reenactment were similar. Defendant was arrested for negligent homicide in connection with the shooting.

Defendant said he had called Captain Buatt on February 10 because the victim "was still missing and the people at Little Prairie" told him to make the call. Captain Buatt testified:

> I found that very unusual . . . . He knew exactly where his body was. Why didn't he just tell us at that point why he – you know, when he shot [the victim], he should have let us know something instead of let us search for three days.

15

Captain Buatt examined the area Defendant identified and found "[f]rom where [Defendant] told me he was standing to where [the victim]'s body was found, it was a fairly open line of sight." If a person or deer had been moving from the west to the east, "[i]t was relatively thick" in the area toward the east. Fully grown deer in the area were "at the top of the back at the top of the shoulders" about thirty-four to thirty-six inches tall. The victim was sixty-seven inches tall. Defendant told Captain Buatt he picked up his spent shells "because he was scared."

Law officers found parts of a freshly-killed deer on the bank at the end of the canal near the location where the boat the victim used was tied, approximately one mile from where the body was found. Captain Buatt learned the deer had been shot either late on the night of February 8 or early in the morning on February 9. He agreed the best place to shoot a deer in that area was where he "could see across a levee, similar to what [Defendant and the victim] were doing." The shooting, however, occurred when deer season was closed.

Mark Kurowski of the Acadiana Criminalistics Laboratory determined that the pattern of the pellet penetrations on the victim's jacket were consistent with a shot pattern of forty to seventy feet from the shotgun's muzzle to its target. At least two shots were fired through the trees and brush and struck the victim in a right to left direction for the shooter. Mr. Kurowski's conclusions were consistent with what Defendant told law enforcement.

The autopsy reported the cause of the victim's death was "[s]hotgun gunshot wounds to the head, neck, torso and upper extremity," and the manner of death was homicide. The body contained a total of twenty-nine projectile injuries, all with a left to right, upward, and back to front trajectory, with the head turned slightly to the right. Lead shot was recovered from the right arm, maxillary sinus, left

clavicle, left sternocleidomastoid muscle, left pectoral major and minor muscles, left and right thoracic cavities, and brain. Tests of urine and blood from the body showed the presence of amphetamines and cocaine/metabolites.

<em>LAW AND ANALYSIS</em>

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). No one witnessed this shooting; only Defendant knows absolutely what happened. No physical evidence establishes or negates Defendant's intent. Without question, Defendant intentionally fired the shotgun. The issue, however, is whether he intended to kill or cause great bodily harm to the victim.

Witness testimony did not establish a motive for Defendant to kill the victim. If Defendant shot the victim over unpaid money, he would not have left $527.00 in the victim's wallet. If Defendant wanted the fishing contract to himself, he would require significant help to provide ten thousand pounds of fish per week. The motives suggested by the witnesses simply do not make sense.

On the other hand, Defendant left the victim either dead or dying in the marsh without even attempting to render or summon any aid. He suggested foul play when he knew the victim was already dead from what he now says was an accident. He engaged in insignificant activities – picking onions, attending a gumbo supper with friends, herding sheep – when he knew the victim's body was in the marsh. He even suggested that animals might harm the body, as they actually did. He stood by and watched others diligently search for the victim and did nothing until the body was discovered. Indeed, he consistently and repeatedly denied any involvement with the shooting from the time it occurred on Wednesday

17

until Sunday morning. He even took active steps to divert attention from himself, asking Mr. Herpin to search for the victim and telling Captain Buatt that Mr. Herpin had lied about finding the victim. He suggested Mr. Herpin was a prime suspect to Ms. Hardy because he delayed the search in order to gain time to move the body and bolster his innocence. Even Defendant's wife, to whom he was closest, noticed nothing unusual about him until the day after the shooting. Defendant invented stories about his hunting trip with the victim even to her. He let her worry about the victim being cold when he did not return from the marsh. Even though Suzanne was the person closest to Defendant, he would not even tell her that he was hunting deer out of season.

Nevertheless, none of these actions, while certainly odd for someone who had just killed a friend, suggest a motive for murder or establish Defendant's specific intent to kill the victim. The State presented no direct evidence to establish Defendant's specific intent to kill. No witness established a motive for murder.

It is true that "[e]vidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt." *State v. Davies*, 350 So.2d 586, 588 (La.1977). However, the evidence of Defendant's elaborate attempts to avoid apprehension only indicate that Defendant knew that he had committed a crime, not that that he had motive sufficient to establish the specific crime of second degree murder.

We find that the State did not exclude every reasonable doubt that Defendant had the specific intent to kill the victim. Accordingly, the evidence was insufficient to support Defendant's conviction for second degree murder.

18

"Pursuant to La.Code Crim.P. art. 821(C), an appellate court that finds 'the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense . . . may modify the verdict and render a judgment of conviction on the lesser included responsive offense.'" *State v. Teague*, 04-1132, p. 9 (La.App. 3 Cir. 2/2/05), 893 So.2d 198, 205. Guilty of negligent homicide is a responsive verdict to the charge of second degree murder. La.Code Crim.P. art. 814(45). Accordingly, we reverse Defendant's conviction for second degree murder, enter a judgment of guilty of negligent homicide, and remand this matter for resentencing in accordance with this court's ruling.

## MOTION FOR NEW TRIAL

Defendant contends that the trial court erred in denying his motion for new trial based on the violation of his constitutional rights as pronounced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972). His motion was based on newly discovered evidence of Mr. Raspberry's status as a confidential informant and of charges dismissed against him that required a new trial. Defendant claims the evidence was material to the issue of motive and hampered his ability to cross-examine Mr. Raspberry.

### *STANDARD OF REVIEW*

In *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, *cert. denied*, 132 S.Ct. 1794 (2012), the defendant filed a motion for new trial arguing that he discovered new evidence after trial that questioned the credibility of a significant witness. He alleged the State had suppressed the evidence in violation of *Brady,* 373 U.S. 83.

Our supreme court noted:

The suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963). The *Brady* rule encompasses evidence which impeaches witness testimony when the reliability or credibility of that witness may determine guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *State v. Knapper*, 579 So.2d 956, 959 (La.1991). *Brady* also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange for his testimony at trial. *Giglio v. United States*, 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Moreover, to the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope of knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *State v. Brady*, 381 So.2d 819, 822 (La.1980) (collecting cases); *State v. Vale*, 95–577, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding his conduct. *Vale,* 666 So.2d at 1072; *State v. Nash*, 475 So.2d 752, 755–756 (La.1985); *see also State v. Bailey*, 367 So.2d 368, 371 (La.1979) (When circumstances indicated the witness might have received the impression that testimony favorable to the State would result in dropping of charges against him, defendant was entitled to new trial where information was not revealed.)

Nonetheless, *Brady* and its progeny do not establish a general rule of discoverability. The prosecutor does not violate his constitutional duty of disclosure "unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *Agurs*, 427 U.S. at 109–110, 96 S.Ct. at 2400. Establishing the proper standard of materiality, the Court wrote:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

*Id.*, 427 U.S. at 112–113, 96 S.Ct. at 2402.

> For purposes of *Brady's* due process rule, a reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *see also State v. Strickland*, 94–0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the material to an outcome-determinative test in which it weighs the probabilities that the defendant would have obtained an acquittal at trial or might do so at a second trial. Instead, a *Brady* violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381). In sum, *Brady* analysis requires the movant to satisfy a three-prong test: 1) favorable (impeaching or exculpatory) evidence; 2) that must have been withheld; and 3) prejudice must have been caused thereby. *Strickler v. Greene*, 527 U.S. 263, 281–282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

*Sparks*, 68 So.3d at 485-86.

## *FACTS*

At the hearing on the motion for new trial on November 21, 2013, Drew David, commander of the Vermilion Parish Sheriff's Office Narcotics Division Task Force, testified that Mr. Raspberry was a confidential informant in an unrelated around October of 2012.[2] Mr. Raspberry was a confidential informant for approximately five months. Captain David wrote a letter to the District Attorney to ask that two drug charges be dismissed as consideration for Mr. Raspberry's work with the Task Force. In a second letter, Captain David asked for guns seized from Mr. Raspberry to be returned to Mr. Raspberry. He testified he would have to have the Sheriff's permission to write such letters, and the District Attorney would make the decision to grant or reject the request.

---

[2]The record of the hearing of the motion for new trial was sealed by order of the trial court.

Captain David "had no clue [Mr. Raspberry] was a witness for the State" in this case until he learned of the motion for new trial. When asked if he knew Mr. Raspberry was a key witness against Defendant, Captain David responded "I did not know that when I met him; I did not know that when I wrote the letters. . . ." He also did not know that Mr. Raspberry was a witness at the grand jury session or at the pre-trial hearing in Defendant's case. Captain David offered nothing to secure Mr. Raspberry's testimony; he could not have done so because he did not know Mr. Raspberry was a witness.

Charges of possession of marijuana and possession of weapons while in possession of drugs were filed against Mr. Raspberry on January 26, 2011. Captain David testified that he did not ask Mr. Raspberry to give any statements concerning this matter in exchange for dismissal of the charges.

Mr. Raspberry also testified at the hearing that he knew he was having charges against him dismissed in consideration for helping the police. However, the offer to dismiss the charges was not made in exchange for his testimony in this matter. He said a domestic violence charge involving a girlfriend and a marijuana charge were dismissed. He learned that the charges would be dismissed prior to the trial of this matter when Stanton Hardee, the Assistant District Attorney who tried this case, sent him a text message. Mr. Raspberry did not know why the charges were dismissed, but he did not think it had anything to do with this case. He specifically testified "[n]obody offered me anything" in exchange for testimony to the grand jury, at the pre-trial hearings, or at trial.

Even though Mr. Raspberry spoke with Elliot Broussard of the Vermilion Parish Sheriff's Office about "cutting a deal," that was "[i]n reference to another case[.]" Mr. Raspberry stated, "I'm telling you that [the dismissal of charges] had

22

absolutely nothing to do with this trial . . . It had nothing to do with it. I don't have to think about it - - nothing to do with it." He reviewed his statements and "what the trial was going to be about" with Stanton Hardee a week before the pre-trial in this matter, "and that was it." Mr. Raspberry watched a video of his February 15, 2011 interview at that time.

On February 15, 2011, Mr. Raspberry was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), and he gave a statement to Detective Anthony Vice. He was not promised anything, threatened, or coerced regarding this statement. Mr. Raspberry told Detective Vice that on three occasions, Defendant said they could kill the victim and get away with it. At the hearing, Mr. Hardee stated that took place before he ever started working for the District Attorney's office.

Mr. Raspberry gave substantially the same testimony at the grand jury, pre-trial hearing, and trial.[3] Neither Mr. Hardee, anyone from the Task Force, nor any police or Sheriff's officer ever offered him anything to secure his testimony. The case in which Mr. Raspberry assisted the Sheriff's office had nothing to do with Defendant.

Sergeant Broussard had the most contact with Mr. Raspberry regarding his confidential informant status. Mr. Raspberry's guns were returned to him at his request after approval of the District Attorney's office. The charges against Mr. Raspberry were dismissed in May 2011. According to Sergeant Broussard, Mr.

---

[3]The State filed a disclosure clarifying Mr. Raspberry's grand jury testimony. Apparently Mr. Raspberry was confused about the sequence of Defendant's statements pertaining to murdering the victim. The disclosure indicated Mr. Raspberry told the grand jury Defendant said they could kill the victim and get away with it three times, the first two times at Defendant's trailer, and the third time at Mr. Raspberry's office trailer. The disclosure explained the first and third remarks took place at Defendant's trailer, but the second took place at Mr. Raspberry's office trailer.

Raspberry "had cooperated with us so he had some charges that he had pending that were before my time. Once he cooperated with us, I went to my supervisor and explained to him that he had cooperated and my supervisor wrote a letter requesting assistance with his charges. . . ." Mr. Broussard was not involved in the investigation of Defendant's case; he worked in narcotics, a separate division. Mr. Raspberry began working as a confidential informant in October 2012. At the time of the hearing of the motion for new trial on November 21, 2013, his file was not closed. Sergeant Broussard offered Mr. Raspberry nothing in exchange for his testimony in Defendant's case, and he was not involved in the investigation. He never asked Mr. Raspberry for information about drug cases involving Defendant.

Sergeant Vice likewise testified at the hearing that he never offered Mr. Raspberry anything in exchange for his testimony against Defendant. He did not know Mr. Raspberry had charges against him dismissed, and he did not know Mr. Raspberry worked as a confidential informant until the day of the hearing.

*ANALYSIS*

Applying the test of *Brady*, 373 U.S. 83, the withheld evidence at issue must be impeaching or exculpatory and prejudicial. The evidence of Mr. Raspberry's confidential informant status does not exculpate Defendant in any manner. Further, Defendant has not shown it is impeaching in any manner.

The issue is whether the withheld evidence is prejudicial. Defendant claims Mr. Raspberry's testimony provided a motive for murder. Motive, however, is "[s]omething, esp. willful desire, that leads one to act." Black's Law Dictionary (9th ed. 2009). The statements Mr. Raspberry said Defendant made – that they could kill the victim and get away with it – show nothing that would lead Defendant to act. That statement suggests no reason Defendant would want to kill

24

the victim. The alleged statement simply stated something they could do, not why they would want to do it. It does not indicate something that would lead them to act; thus, Mr. Raspberry's testimony does not suggest a motive for the shooting.

The record shows that Mr. Raspberry was charged with possession of marijuana and possessing a firearm while in the possession of drugs on January 26, 2011. However, he was not arrested for these offenses. The charges were filed two weeks before the victim died. Likewise, Mr. Raspberry was charged with domestic abuse battery on November 8, 2011, but he was not arrested for this offense. All of these events occurred prior to the date of Stanton Hardee's employment with the District Attorney's office in March 2012.

On April 16, 2013, Captain David wrote Mr. Hardee to request the dismissal of Mr. Raspberry's drug charges in consideration for his cooperation. Mr. Hardee filed the motion to dismiss the charges on May 2, 2013. Thus, at the time of Mr. Raspberry's trial testimony, the State had nothing to "hold over" him in exchange for his testimony. Mr. Raspberry could not gain from testifying in any particular manner or to any particular facts. With the minor exception of where Defendant made the statements, Mr. Raspberry's testimony was consistent throughout the proceedings.

Further, Defendant has not shown whether evidence of the dismissal of Mr. Raspberry's charges would have been admissible at trial. "Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal." La.Code Evid. art. 609.1(B).

In *State v. Boyer*, 10-693 (La.App. 3 Cir. 2/2/11), 56 So.3d 1119, *writ denied*, 11-769 (La. 1/20/12), 78 So.3d 138, a witness had already been convicted of obstruction of justice in connection to the defendant's crime and was on probation at the time he testified at the defendant's trial. Part of his plea bargain required him to testify truthfully at the trial. He knew the District Attorney controlled whether his probation would be revoked. Nevertheless, the witness had no pending charges the witness could use to bargain for leniency.

The trial court refused to allow the defendant to question the witness about an unrelated domestic abuse incident on which no charge was pending, the witness had not been convicted, and the State had no prospect of prosecution. This court held the trial court did not abuse its discretion because the defendant could not attack the witness's character by inquiring into particular acts not resulting in a conviction. *See* La.Code Evid. art. 608. Additionally, the possibility of "prejudice, confusion of the issue, or misleading of the jury" outweighed any relevance of the evidence. *Boyer*, 56 So.3d at 1130.

Here, Mr. Raspberry's drug and domestic abuse charges were not pending at the time of his testimony, did not lead to convictions, and were no longer subject to prosecution. Nothing about the dismissals suggested Mr. Raspberry or anyone else had been untruthful about the charges or about his confidential informant status. Introduction of the evidence may have influenced the jury's opinion of Mr. Raspberry's character.

Certainly, the State should have told Defendant that Mr. Raspberry was a confidential informant, and charges against him had been dismissed. Defendant has never claimed the lack of disclosure was intentional or used by the State with the intent to obtain a certain result. The withheld evidence does not create a

reasonable doubt of Defendant's guilt. Defendant received a fair trial despite the withheld evidence and the trial court did not err in denying Defendant's motion for new trial.

## DECREE

Defendant's conviction for second degree murder is vacated and a guilty plea for negligent homicide is entered. This matter is remanded for resentencing.

**SECOND DEGREE MURDER CONVICTION VACATED; VERDICT OF NEGLIGENT HOMICIDE ENTERED; REMANDED FOR RESENTENCING; AFFIRM DENIAL OF MOTION FOR NEW TRIAL.**

NUMBER 14-435

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

QUINT MIRE

AMY, J., dissenting.

Although I agree with the majority that the trial court did not err in denying the motion for new trial, I would affirm the second degree murder conviction, as rendered by the jury.

The majority opinion finds insufficient evidence that the defendant had the specific intent to kill the victim, specifically addressing whether the evidence revealed a motive for the crime. *See State v. Carmouche,* 12-1052 (La.App. 3 Cir. 4/3/13), 117 So.3d 136 (wherein a panel cited *State v. Mart*, 352 So.2d 678 (La.1977) for the proposition that, although motive is not an essential element of second degree murder, an absence of motive may be considered as a circumstance mitigating against specific intent). The majority opinion further finds that the State did not exclude every reasonable doubt as to specific intent. I respectfully disagree.

Notably, jurors heard Gregory Raspberry testify that, on several occasions, the defendant spoke of killing the victim. Any assessment as to his credibility was certainly within the province of the jury, as the trier of fact. *See State v. Oliphant*, 13-2973 (La. 2/21/14), 133 So.3d 1255. The jury also heard witness statements indicating that the defendant and the victim had experienced conflict, that the victim allegedly owed the defendant money, that the defendant admitted to

repeatedly discharging his weapon (resulting in multiple projectile injuries to the victim), that the defendant left the victim in the marsh at the scene, and that the defendant misled and misdirected those searching for the victim in the days after the incident. Given the jury's fact-finding role and its apparent rejection of the defendant's version of events, I find these factors sufficiently support the jury's determination of specific intent to kill the victim or to inflict great bodily harm.

For these reasons, I respectfully dissent from the majority opinion.